POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Attorney for Plaintiff*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GAURAV TRIPATHI, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | CLASS ACTION |
| v. | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| ENPHASE ENERGY, INC., BADRINARAYANAN KOTHANDARAMAN, and MANDY YANG, | |
| Defendants. | DEMAND FOR JURY TRIAL |

1.    Plaintiff Gaurav Tripathi ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Enphase Energy, Inc. ("Enphase" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the

1

Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

2.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Enphase securities between April 22, 2025 and October 28, 2025 both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

3.     Enphase is a global energy technology company founded in March 2006, focusing on solutions for solar generation, storage, and communication.

4.     To boost its growth, Enphase partners with solar and battery financing companies ("TPOs") that offer arrangements of third-party ownership of solar and battery products to homeowners, such as lease and power purchase agreements.

5.     At all relevant times, when Enphase reported its revenue or provided revenue guidance, it broke out "safe harbor revenue", which it defines as "sales made to customers who plan to install Enphase's products over more than a year".

6.     At all relevant times, expenditures on solar products, including Enphase's product offerings, were eligible for favorable tax treatment in the U.S.  As relevant here, the Residential Clean Energy Credit pursuant to Internal Revenue Code Section 25D (the "25D Credit") allowed homeowners to deduct 30% of costs of clean energy property they installed at their homes.

7.     However, on July 4, 2025, U.S. President Donald Trump signed into law the One Big Beautiful Bill Act ("OBBB"), which provided that the 25D Credit would terminate later that year, after the Class Period ended.  Instead of terminating on December 31, 2032, as it would have

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

as originally enacted, the 25D Credit would now terminate seven years earlier on December 31, 2025.  Homeowners who purchased clean energy products, including various Enphase products, before the new termination date would still be able to claim the 25D Credit.

8.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Enphase overstated its ability to manage its channel inventory; (ii) Enphase overstated its ability to mitigate effects arising from the termination of the 25D Credit; (iii) accordingly, Enphase overstated its financial and operational prospects; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

9.      On October 28, 2025, Enphase reported its financial results for the third quarter of 2025 and held a related earnings call.  Among other items, Enphase's management reported that it expected 2025 to close on a weak note, with elevated channel inventory resulting in lower battery storage shipments in the fourth quarter, and that the expiration of the 25D Credit would negatively impact revenues for the first quarter of 2026.

10.     On this news, Enphase's stock price fell $5.56 per share, or 15.15%, to close at $31.14 per share on October 29, 2025.

11.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

14.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Enphase is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

15.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## **PARTIES**

16.     Plaintiff, as set forth in the attached Certification, acquired Enphase securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

17.     Defendant Enphase is a Delaware corporation with principal executive offices located at 47281 Bayside Parkway, Fremont, California 94538.  Enphase's common stock trades in an efficient market on the NASDAQ Global Market ("NASDAQ") under the ticker symbol "ENPH".

18.     Defendant Badrinarayanan Kothandaraman ("Kothandaraman") has served as Enphase's President and Chief Executive Officer at all relevant times.

19.     Defendant Mandy Yang ("Yang") has served as Enphase's Executive Vice President and Chief Financial Officer at all relevant times.

20.     Defendants Kothandaraman and Yang are referred to herein collectively as the "Individual Defendants".

4

21.    The Individual Defendants possessed the power and authority to control the contents of Enphase's SEC filings, press releases, and other market communications.    The Individual Defendants were provided with copies of Enphase's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.    Because of their positions with Enphase, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.    The Individual Defendants are liable for the false statements and omissions pleaded herein.

22.    Enphase and the Individual Defendants are collectively referred to herein as "Defendants".

## SUBSTANTIVE ALLEGATIONS

### Background

23.    Enphase is a global energy technology company founded in March 2006, focusing on solutions for solar generation, storage, and communication.

24.    To boost its growth, Enphase partners with TPOs that offer arrangements of third-party ownership of solar and battery products to homeowners, such as lease and power purchase agreements.

25.    At all relevant times, when Enphase reported its revenue or provided revenue guidance, it broke out "safe harbor revenue", which it defines as sales made to customer who plan to install Enphase's products over more than a year.

26.     At all relevant times, expenditures on solar products, including Enphase's product offerings, were eligible for favorable tax treatment in the U.S.  As relevant here, the 25D Credit allowed homeowners to deduct 30% of costs of clean energy property they installed at their homes.

### Materially False and Misleading Statements Issued During the Class Period

27.     The Class Period begins on April 22, 2025, when Enphase filed a quarterly report on Form 10-Q concerning its financial results for the fiscal quarter ended March 31, 2025, issued a press release announcing those results, and held a conference call to discuss the same (the "Q1 Earnings Call").  During the Q1 Earnings Call, Defendant Kothandaraman made the following statements concerning Enphase's planned actions "to realign our supply chain to minimize downside across a range of scenarios"[1]:

> While the global policy environment remains fluid with tariffs, with interest rates and subsidies constantly evolving, ***we are moving quickly to realign our supply chain to minimize downside across a range of scenarios.  While we cannot control the macroeconomic conditions, we can absolutely control our response***.  This means doubling down on what has always made Enphase successful, relentless product innovation, world class reliability and exceptional customer service.

28.     During the same call, Phil Shen of ROTH Capital Partners asked Defendant Kothandaraman about his expectations regarding Enphase's revenue during the second half of 2025 and the first quarter of 2026.  In response, Defendant Kothandaraman stated that "we normally don't guide for Q3 or Q4, but we have a few vectors going for us", and proceeded to detail several new product offerings "that we are relying on for growth":

> Right.  ***Phil, you know, that we normally don't guide for Q3 or Q4, but we have a few vectors going for us.  I just talked about the fourth generation system, and we believe that's a huge factor for Enphase.  Then we specifically regarding the US, we have the IQ9 that is going to be turning on in Q4.***
>
> Then coming to Europe, all of the new products — we have introduced a large array of new products, which we are already seeing some good traction, namely the FlexPhase Battery, which provides three phase backup for many countries in Europe.

---

[1] All emphases herein are added unless otherwise indicated.

The Balcony Solar, which basically, we are about to introduce it this quarter. So it's no longer something out there. It's going to ramp-in this quarter. Balcony Solar is going to address, for example, the [total addressable market] in Germany alone is 400 megawatts. And after Germany, we are going to go to Belgium and many other European countries. After that, we will go to Japan and India as well.

So we expect new product to also be introduced in Q2. And the next one is our IQ EV charger, the latest EV charger. We did a good job ramping-up so that we can service all 14 countries in Q1. And now we got to grow from strength to strength there in terms of installer partnerships and EV charger partnerships in general through other companies there.

**So while the policy situation, et cetera, is uncertain, Enphase is trying to control our destiny by introducing new products, by having discipline and these are the new product vectors that we are relying on for growth**.

29.    Later during the Q1 Earnings Call, David Benjamin of Mizuho Securities asked Defendant Kothandaraman whether his statement earlier during the call that "channel inventory was slightly up" "impl[ied] any potential new destocking?" In response, Defendant Kothandaraman stated:

**No**, the channel inventory is, okay, is up because when your sell-through goes down, the channel inventory can go slightly up, out of our usual targets. Our targets are between eight and 10 weeks. So — but when your sell-through is down more than what you anticipated, then that can go slightly up.

**The ways to recover it back are quite simple, not ship much into the channel and then improve the sell-through in a seasonal quarter like Q2, which is bound to have more sell-through in Q2 than Q1. So we believe it's a normal cycle, and we are disciplined to control the amount of material in the channel with that discipline, it should come back quickly inbound.**

30.    On July 4, 2025, U.S. President Donald Trump signed into law the OBBB, which provided that the 25D Credit would terminate later that year, after the Class Period ended. Instead of terminating on December 31, 2032, as it would have as originally enacted, the 25D Credit would now terminate seven years earlier on December 31, 2025. Homeowners who purchased clean energy property, such as Enphase products, before the new termination date would still be able to claim the 25D Credit.

31.    On July 22, 2025, Enphase filed a quarterly report on Form 10-Q concerning its financial results for the fiscal quarter ended June 30, 2025, issued a press release concerning the same (the "Q2 Earnings Release"), and held a conference call to discuss the same (the "Q2 Earnings Call").  In the Q2 Earnings Release, Enphase announced its guidance for Q3 2025, including "[r]evenue to be within a range of $330.0 million to $370.0 million".

32.    During his prepared remarks on the Q2 Earnings Call, Defendant Kothandaraman provided an update on channel inventory, stating *inter alia* "[a]s we exited Q2, our battery channel inventory was normal, while our microinverter channel inventory was slightly elevated".

33.    Defendant Kothandaraman's prepared remarks during the Q2 Earnings Call also concerned the recent changes to solar energy tax credits following passage of the OBBB.  Among other representations, Defendant Kothandaraman stated:

> As we head into 2026, the U.S. solar industry must evolve rapidly in response to the recent tax reconciliation bill.  First, we expect an accelerated shift towards leases and [power purchase agreements ("PPA")] anchored by the 48E tax credit through 2027.  Second, batteries will become central to every solar sale propelled by declining installation costs, long-term credit — tax credit support through 2033 and growing homeowner demand for energy resilience and participation in VPPs.  Third, the industry must drive down customer acquisition and selling costs to remain competitive in a maturing market.  ***We believe these structural shifts, coupled with the escalating utility rates and increasing grid instability create a tailwind for sustained demand in the residential solar plus storage.***

34.    Defendant Kothandaraman also provided Enphase's guidance for the third quarter of 2025 during his prepared remarks, stating *inter alia*:

> ***We expect revenue to be in the range of $330 million to $370 million.  We anticipate continued growth in the U.S.*** and seasonal softness in Europe. We are approximately 75% booked to the midpoint of our revenue guidance.  For IQ batteries, we expect to ship between 190 and 210 megawatt hours during the quarter.  ***We are actively engaged with several TPO partners who are awaiting further clarity on safe harbor rules following the recent executive order, and we remain well positioned to support them once they finalize their plans***.

35.    Defendant Yang also provided investors with Enphase's projection of its revenue for the third quarter of 2025 during his prepared remarks, stating *inter alia* ***"[w]e expect our***

*revenue for Q3 to be within a range of $330 million to $370 million*, which includes shipments of 190 to 210 megawatt hours of IQ Batteries".

36.    During the question-and-answer portion of the Q2 Earnings Call, Wells Fargo analyst Praneeth Satish asked Defendant Kothandaraman to "elaborate" on his remarks concerning "partnering with TPO providers and introducing some creative financing structures that could help maximize the tax credit capture", and to share how he "expect[ed]" Enphase's market share with TPO providers "to evolve in 2026".  In response, Defendant Kothandaraman stated that that he expected demand to drop 20% in 2026 due to expiration of the 25D Credit, and that Enphase would work with TPO providers in three ways to maximize capture of the 25D Credit and through bringing lease financing access to so-called long-tail installers "[w]e can prevent a market erosion", stating:

> *We work with every one of these TPO customers.  We work with every single one.  And right now, we are in deep discussions with them because what we have is we know how to service long-tail installers.  We have the relationships with the long-tail installers.  And if we can bring lease financing access to the long tail.  We can prevent a market erosion, overall market erosion.  So that's what we are aiming to do.  And we are working with a lot of the TPOs.*  We aren't ready to share more details yet, but we will share those very soon, perhaps in the next earnings call.  And we are looking to move on it aggressively.  So let me leave it at that.

37.    Satish also asked Defendant Kothandaraman "how do you intend on managing field inventories with distributors for the balance of the year," given that he anticipated demand to decline in 2026 once the 25D credit expired.  Satish continued to ask whether he "plan[ned] to undership micros in either Q3 or Q4 to help reduce inventories" or if instead he "[thought] inventories could just get rightsized more organically if we see maybe a pull forward of demand or some safe harbors in the second half?"  In response, Defendant Kothandaraman stated:

> I think you answered the question yourself.  Basically, that's exactly what we expect.  *We expect 25D increase in demand, which will come from the channel and make the channel at reasonable levels by the end of the year*.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

38.    Later during the Q2 Earnings Call, analyst Philip Shen of ROTH Capital asked Defendant Kothandaraman "how much safe harbor [he] expect[ed] in the Q3 revenue", in apparent reference to the guidance provided in ¶¶ 31, 34–35 *supra*, and "how" he "expect[ed]" "pull forward of demand" to "manifest," whether as "a Q4 element" or "an upside surprise to Q3". In response, Defendant Kothandaraman stated:

> So first of all, *the Q3 revenue guidance does not include any safe harbor. As I said, we are working with several TPO partners, and they are all looking at recently -- at the recent Executive Order, and they are waiting for further clarity. And once they have that clarity, they will take the actions*. From our side, what we are doing is to ensure that we are ready in terms of capacity. Any time that they want the product, we are going to be ready in order to service them.
>
> *On your 25D question, I think we will see the 25D demand possibly in early Q4 is what we will start seeing*. Right now, we aren't seeing it, but we still have August and September left. So that's what I expect that we'll start seeing it soon. I'm sure that installers — some installers will have to make workforce changes. They may have to add temporary teams in order to feed the rush, and that — those all take a little bit of time. *And so I'm sure it's coming in Q4.*

39.    Shen also asked Defendant Kothandaraman "how did we get to elevated channel levels. Was there a pause earlier in the year? Or did you overship into the channel? And what are the levels? . . . I mean are we talking about 12 weeks now or something higher?" In response, Defendant Kothandaraman stated:

> The question on channel, we are completely transparent to you. It is — we *are actually in very good shape in channel management.* We — our experience in the last two years on the quantity of undershipment, et cetera, that we had, we have recognized that's an anomaly, and we will never get to that stage. So whenever I say slightly above, it should mean slightly above 8% to 10%. That's what it means.

40.    Later during the Q2 Earnings Call, an analyst from Jefferies asked Defendant Kothandaraman about safe harbor revenue during Q4, given that the 25D Credit would expire later that year. This analyst asked whether "we [will] see loan originations" in the fourth quarter "given that uncertainty on timing of install?" After Defendant Kothandaraman clarified which tax credit the analyst's question concerned and stated "the consumer has to pay for it as well as the system

10

should be installed by the year-end", the analyst continued "[s]o unless you expect to see that in 4Q, do you think that will actually happen because there might be some uncertainty on loan originations, right?"  In response, Defendant Kothandaraman stated *inter alia*:

> Well, our opinion is it will happen.  Our installers are experts.  They know what to do.  And I think right now, they need to make sure they expand their crews so that they start to cater to the demand rush.  But they have a lot of experience.  They can get solar installations done quickly.  So I do expect it to happen.

41.     Also during the Q2 Earnings Call, analyst Dylan Nassano of Wolfe Research asked Defendant Kothandaraman to share more information about "the TPO players you're currently in discussions with", and whether he had "identified any potential obstacles when it comes to helping the long tail shift to the leases?"  In response, Defendant Kothandaraman stated "*[w]e work with every TPO, and we are having conversations with almost 80% of them right now on safe harbor*."  Nassano also asked whether any of Enphase's customers were "indicating they'd rather just try to sell cash systems without credits", to which Defendant Kothandaraman replied *inter alia*: "*we are having -- just to tell you this, we are having installer roundtables every week. and every week is from a different region to exactly ask the same question.  How are you managing this transition?*  Some of them are absolutely confident of selling cash and loans still.  Some of them are pivoting towards lease and PPA.  So the answer is mixed."

42.     On August 5, 2025, Enphase issued a press release announcing a "new safe harbor agreement with a solar and battery financing company that offers third-party ownership (TPO) agreements to homeowners, including leases and power purchase agreements (PPAs)."

43.     On August 19, 2025, Enphase issued a press release announcing a second new safe harbor agreement, "signed earlier in August," with "another leading solar and battery financing company that offers third-party ownership (TPO) agreements to homeowners, including leases and power purchase agreements (PPAs)."  The press release stated that the agreement "is expected to generate approximately $50 million in revenue".  The press release further stated that this safe

harbor agreement "underscores the company's strong participation in the TPO segment – a critical growth channel for U.S. residential solar and batteries."

44.     The statements referenced in ¶¶ 27–29, 31–43 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Enphase overstated its ability to manage its channel inventory; (ii) Enphase overstated its ability to mitigate effects arising from the termination of the 25D Credit; (iii) accordingly, Enphase overstated its financial and operational prospects; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

45.     On October 28, 2025, Enphase filed a quarterly report on Form 10-Q with the SEC announcing its financial results for the fiscal quarter ended September 30, 2025, issued a press release announcing the same, and on the following day, held a conference call to discuss those results (the "Q3 Earnings Call").  In the press release, Enphase's management reported that it expected 2025 to close on a weak note, stating "Enphase Energy estimates . . . [r]evenue to be within a range of $310.0 million to $350.0 million", while analysts had estimated Q4 revenue guidance to fall between $374.4 million and $383 million.  Enphase's management also reported revenue of $410.4 million, but noted that this figure "included $70.9 million of safe harbor revenue".

46.     During the associated earnings call, Defendant Kothandaraman attributed "this lower revenue guidance" to two factors.  First, Enphase's Q3 revenue included $70.9 million of safe harbor revenue, which Defendants define as "any sales made to customers who plan to install the inventory over more than a year."  Defendant Kothandaraman stated that this safe harbor

revenue "pulled in from Q4 to Q3 as customers wanted the product before the U.S. Treasury guidance in Q3."[2]   Second, Defendant Kothandaraman stated "we are reducing shipments of product to the channel in order to destock the channel as we head into 2026," in contrast to his earlier statements denying that Enphase would destock during the Q1 Earnings Call, as alleged *supra* ¶ 29, denying that Enphase would undership during the Q2 Earnings Call, as alleged *supra* ¶ 37, and claiming that Enphase was in "very good shape in channel management" during the Q2 Earnings Call, as alleged *supra* ¶ 39.

47.    Enphase's management further reported revenue of $410.4 million.  However, as stated *supra* ¶ 45, $70.9 million of this was safe harbor revenue.  Without this safe harbor revenue, which Defendant Kothandaraman indicated was ***not*** included in the Company's Q3 guidance of $370 million to $410 million, *see supra* ¶ 38, Enphase would have reported revenue of just $339.5 million for the quarter, 8.24% below the lower end of its guidance.

48.    During the Q3 Earnings Call, Enphase's management also reported that the expiration of the residential solar investment tax credit would negatively impact revenues for the first quarter of 2026.  Defendant Kothandaraman stated in his prepared remarks "we anticipate a larger-than-normal seasonal decline following the expiration of the 25D tax credit", in contrast to earlier assurances as alleged *supra* ¶¶ 33, 36, and further stated that Defendants "estimate a company revenue of $250 million".

49.    On this news, Enphase's stock price fell $5.56 per share, or 15.15%, to close at $31.14 per share on October 29, 2025.

---

[2] This U.S. Treasury guidance concerned another tax credit, the Clean Electricity Investment Credit, which the OBBB curtailed.  Taxpayers whose solar and wind projects were not in service before January 1, 2028, would not be able to claim the credit, but those that began construction before July 4, 2026 would not face this in-service deadline.  The U.S. Treasury guidance provided greater clarity on the definition of "beginning construction," removing a safe harbor previously in place that stated projects began construction once the project owner incurred five percent of the associated costs.

50.     Several analysts seized on Enphase's Q4 2025 and Q1 2026 projections when announcing reduced price targets.  For example, on October 28, 2025, Evercore ISI reduced its price target 17.5%, from $40 to $33, writing "[t]he Company does expect 1Q26 to be the trough" and that it was "weary of anticipating a 'hockey-stick' like inflection during 2H26".  On October 29, 2025, BMO Capital Markets Corp. reduced its price target 15.5%, from $36.70 to $31.00, noting that Q3 revenue only beat projections due to the $70.9 million of safe harbor revenue Enphase reported, and writing "[m]ore importantly, management indicated it sees 1Q'26 revenues of $250mm, well below our already below-consensus estimate of $270mm (consensus $321mm)." Also on October 29, 2025, Goldman Sachs reduced its price target 9.3%, from $32 to $29, writing that the Q4 guidance had a "midpoint meaningfully below GSe/consensus of $370mn/$381mn," and "[m]anagement provided a preliminary expectation for 1Q26 revenue of ~$250mn given the expiration of the 25D tax credits, which was much lower than our initial $300mn view."

51.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## SCIENTER ALLEGATIONS

52.     During the Class Period, Defendants had both the motive and opportunity to commit fraud.  They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time.  Indeed, at all relevant times, Defendants specifically affirmed their purported ability to manage Enphase's channel inventory.  Defendant Kothandaraman stated that "we are disciplined to control the amount of material in the channel with that discipline," as alleged *supra* ¶ 29.  Defendant Kothandaraman further stated that "we are actually in very good shape in channel management," as alleged *supra* ¶ 39.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

53.    In addition, at all relevant times, Defendants consistently represented that they maintained close, repeated contact with TPO providers concerning their efforts to mitigate losses attributed to changes to the 25D Credit.  Defendant Kothandaraman stated that "We work with every one of these TPO customers.  We work with every single one. And right now, we are in deep discussions with them because what we have is we know how to service long-tail installers", and "[w]e work with every TPO, and we are having conversations with almost 80% of them right now on safe harbor," that "we are having installer roundtables every week," as alleged *supra* ¶¶ 36, 41.

54.    In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

55.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Enphase securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

56.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Enphase securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Enphase or its transfer agent and may be notified of the

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

57.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

58.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

59.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Enphase;

- whether the Individual Defendants caused Enphase to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Enphase securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

60.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

61.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Enphase securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Enphase securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

62.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

63.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

64.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

17

65.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

66.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Enphase securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Enphase securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

67.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Enphase securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Enphase's finances and business prospects.

68.    By virtue of their positions at Enphase, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants

18

acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

69. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Enphase, the Individual Defendants had knowledge of the details of Enphase's internal affairs.

70. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Enphase. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Enphase's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Enphase securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Enphase's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Enphase securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

71.     During the Class Period, Enphase securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Enphase securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Enphase securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Enphase securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

72.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

73.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

74.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

75.     During the Class Period, the Individual Defendants participated in the operation and management of Enphase, and conducted and participated, directly and indirectly, in the conduct of Enphase's business affairs.  Because of their senior positions, they knew the adverse non-public information about Enphase's misstatement of income and expenses and false financial statements.

76.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Enphase's financial condition and results of operations, and to correct promptly any public statements issued by Enphase which had become materially false or misleading.

77.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Enphase disseminated in the marketplace during the Class Period concerning Enphase's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Enphase to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Enphase within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Enphase securities.

78.     Each of the Individual Defendants, therefore, acted as a controlling person of Enphase.  By reason of their senior management positions and/or being directors of Enphase, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Enphase to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Enphase and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

79.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Enphase.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: February 17, 2026                    Respectfully submitted,

                                            POMERANTZ LLP

                                            */s/ Jennifer Pafiti*
                                            Jennifer Pafiti (SBN 282790)
                                            1100 Glendon Avenue, 15th Floor
                                            Los Angeles, California 90024
                                            Telephone: (310) 405-7190
                                            jpafiti@pomlaw.com

                                            POMERANTZ LLP
                                            Jeremy A. Lieberman
                                            (*pro hac vice* application forthcoming)
                                            J. Alexander Hood II
                                            (*pro hac vice* application forthcoming)
                                            600 Third Avenue, 20th Floor
                                            New York, New York 10016
                                            Telephone: (212) 661-1100
                                            Facsimile: (917) 463-1044
                                            jalieberman@pomlaw.com
                                            ahood@pomlaw.com

22

1

*Attorneys for Plaintiff*

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS