**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Lead Plaintiff and the Class*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GAURAV TRIPATHI, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ENPHASE ENERGY, INC., BADRINARAYANAN KOTHANDARAMAN, and MANDY YANG,<br><br>Defendants. | Case No. 4:26-cv-01380-JST<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

## TABLE OF CONTENTS

I. NATURE OF THE ACTION ... 1

II. JURISDICTION AND VENUE ... 2

III. THE PARTIES ... 3

IV. SUBSTANTIVE ALLEGATIONS ... 4

A. Background ... 4

1. Enphase Energy ... 4

2. Channel Inventory ... 6

3. Pre-Class Period Disclosures Concerning Channel Inventory ... 7

B. Competition ... 12

1. The Company Acknowledges that the Solar Industry is Highly Competitive ... 12

2. The Company Warns of the Material Risks From Competition ... 14

3. Material Competition from Telsa's Powerwall 3 ... 16

C. Defendant Badri Attends Quarterly Sales Meetings at Which Defendants and Other Enphase Personnel Discussed the Material Adverse Impact on Enphase's Sales and Channel Inventory ... 22

V. FALSE AND MISLEADING STATMENTS ... 24

VI. THE TRUTH EMERGES ... 37

VII. CLASS ACTION ALLEGATIONS ... 37

VIII. LOSS CAUSATION ... 41

IX. NO SAFE HARBOR ... 41

X. COUNTS ... 41

XI. PRAYER FOR RELIEF ... 44

XII. DEMAND FOR A JURY TRIAL ... 45

1. Lead Plaintiff Heather Stith ("Plaintiff"), individually and on behalf of all other persons similarly situated, by and through her undersigned attorneys, alleges the following against Defendants Enphase Energy, Inc. ("Enphase" or "Company"), Badrinarayanan Kothandaraman ("Badri"), and Mandy Yang ("Yang"), based upon personal knowledge as to Plaintiff's own acts, and information and belief as to all other matters based upon, inter alia, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, review and analysis of Enphase's conference call transcripts, public disclosures, including press releases, United States Securities and Exchange Commission ("SEC") filings, analysts' reports and advisories about the Company, and information readily available from public sources. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

2. This is a federal securities class action against Defendants on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired Enphase's common stock February 4, 2025, through October 28, 2025, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages Defendants' violations of the federal securities laws caused and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

3. On October 29, 2025, Defendants disclosed that too much inventory in the channel portended an erosion of future sales as Enphase destocked or sold less into the channel to correct for a glut of inventory. Even as Defendants acknowledged the need to destock the channel, they blamed macroeconomic factors, such as rising interest rates, and industry factors, such as the elimination on December 31, 2025, of the residential solar installation tax credit, Defendants omitted a material cause of the channel inventory glut.

4. Even before the Class Period, Defendants informed investors that normal channel inventory was eight to ten weeks. By mid-2024, however, Tesla's new Powerwall 3 provided a complete, competitive solution to Enphase's separate microinverters and battery storage units at

a materially lower price point. Tesla's less expensive product materially eroded Enphase's market share such that eight to ten weeks of inventory became "elevated" and not normal.

5. Throughout the Class Period, while describing channel inventory as normal to slightly elevated, meaning eight to ten weeks of channel inventory for both inverters and storage units, however, Defendants knew or recklessly disregarded that channel inventory was bloated—materially elevated—because of the impact of the Powerwall 3 on Enphase's sales.

6. At the end of the Class Period, blaming macroeconomic and industry factors such as high interest rates and the elimination of tax credits, Defendants finally disclosed the need to reduce channel inventory materially, portending poor results in the first half of 2026.

7. On this news Enphase's stock price fell $5.56, or 15.15%, to close at $31.14 on October 29, 2025, harming investors.

## II. JURISDICTION AND VENUE

8. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

9. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

10. Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as Enphase is headquartered in this District, at 47281 Bayside Parkway, Fremont, California, all Defendants conduct business in this District, and a significant portion of Defendants' actions took place within this District.

11. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III. THE PARTIES

12. As set forth in the Certification, Dkt. 14-2, Plaintiff Heather Stith acquired Enphase common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

13. Defendant Enphase is a Delaware corporation with principal executive offices located at 47281 Bayside Parkway, Fremont, California 94538. Enphase's common stock trades in an efficient market on the NASDAQ Global Market ("NASDAQ") under the ticker symbol "ENPH".[1]

14. Defendant Badrinarayanan Kothandaraman ("Badri") has served as Enphase's President and Chief Executive Officer at all relevant times.

15. Defendant Mandy Yang ("Yang") has served as Enphase's Executive Vice President and Chief Financial Officer at all relevant times.

16. Defendants Badri and Yang are referred to herein collectively as the "Individual Defendants" and, with Enphase as "Defendants."

17. The Individual Defendants possessed the power and authority to control the contents of Enphase's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Enphase's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Enphase, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

---

[1] Enphase's fiscal year ends December 31. Plaintiff refers to the third quarter of 2024 as "3Q2024," the fourth quarter of 2024 as "4Q2024," the first quarter of 2025 as "1Q2025," the second quarter of 2025 as "2Q2025," and the third quarter of 2025 as "3Q2025."

## IV. SUBSTANTIVE ALLEGATIONS

### A. Background

#### 1. Enphase Energy

18. According to the Annual Report on Form 10-K Enphase filed with the SEC on February 10, 2025 ("2024 10-K"), Enphase is "an energy technology company[,] deliver[ing] smart, easy-to-use solutions that manage solar generation, storage and communication on one platform." Enphase sells microinverters that "work with virtually every solar panel made." It boasts that its microinverters, "paired with our smart technology, result in one of the industry's best-performing clean energy systems." Enphase claimed to have deployed 4.7 million residential and commercial systems, worldwide. While Enphase is known for its microinverters, it "design[s], develop[s], manufacture[s] and sell[s] home energy solutions that manage energy generation, energy storage, and control and communications on one intelligent platform," claiming to "have revolutionized the solar industry by bringing a systems approach to solar technology and by pioneering a semiconductor-based microinverter that converts energy at the individual solar module level and, combined with our proprietary networking and software technologies, provides advanced energy monitoring and control." Enphase distinguishes microinverters, differentiating it from "a string inverter system using string modules, whether with or without an optimizer, which only converts the energy of the entire array of solar modules from a single high voltage electrical unit and lacks intelligence about the energy producing capacity of the solar array."

19. But Enphase claimed more than just advanced microinverter technology. Rather, it touted The Enphase® Energy System ("EES"). According to the 2024 10-K, the EES "brings a high technology, networked approach to solar generation plus energy storage, by leveraging [Enphase's] design expertise across power electronics, semiconductors and cloud-based software technologies." Deploying EES, Enphase claims to "maximize[] a home's energy potential while providing advanced monitoring and remote maintenance capabilities," all in "a single technology platform for seamless management of the whole solution, including IQ® Microinverters, IQ®

Batteries, IQ® EV Chargers, IQ® Combiner (with embedded IQ® Gateway), and other hardware." Thus, Enphase claims its EES is a one stop solution from power generation to storage, a "complete energy management solutions, which consist of solar, batteries, load control, electrical vehicle ("EV") charging, compatibility with third-party generators, and grid services."

20. According to the 2024 10-K, key to Enphase's strategy is a superior customer experience, delivering value through "products that are productive, reliable, smart, simple and safe, with superior customer service, to enable homeowners' storage and energy independence." Enphase works through distributors, installers, and module partners, who provide, install and service its products, a "first line of association with our ultimate customer, the homeowner and business user." In addition, the Company was focused on innovation, focusing on "[i]ncreas[ing] power and efficiency and reduce cost per watt" and "[i]ncreasing storage energy density and reduce installation time and cost per kWh."

21. In the 2024 10-K, Enphase claimed to "distinguish ourselves from other inverter power and efficiency and reduc[ing] cost per watt." On the engineering front, therefore, the Company claimed to focus on "increase[ing] average power conversion efficiency and alternating current ("AC") output power in order to pair with higher rated direct current ("DC") modules while reducing costs per watt" by increasing storage energy density, and reducing installation time and cost per kWh. With respect to storage solutions, the Company claimed to focus on "increasing the energy density of our battery capacity, quality and reducing installation time and cost per kilowatt hour ("kWh") to make solar-plus-storage resilient, sustainable and affordable for the masses. Focus on the homeowner, distributor and installer partners."

22. According to the 2024 10-K, the Company targeted both residential and commercial customers worldwide, even as "revenue generated from the United States market has represented 70%, 64% and 76% of [Enphase's] net revenues for the annual periods ended on December 31, 2024, 2023 and 2022, respectively. More, the Company "sells primarily to solar distributors who combine our products with others, including solar module products and racking systems, and resell to installers in each target region." Large installers, strategic partners and

original equipment manufacturers ("OEM"), however, also purchased directly from Enphase. According to the Company, "OEM customers include solar module manufacturers who integrate our microinverters with their solar module products and resell to both distributors and installers." In addition, Enphase's "[s]trategic partners include a variety of companies, including industrial equipment suppliers and providers of solar financing solutions."

23. According to the 2024 10-K, Enphase's sales were heavily dependent upon one customer. "In the years ended December 31, 2024, 2023 and 2022," the 2024 10-K stated, "one customer accounted for approximately 48%, 40% and 37%, respectively, of our net revenues." The Company has never disclosed the name of this customer. On information and belief, this customer appears to be CED Greentech, d/b/a Greentech Renewables ("Greentech"), a major distributor of solar systems to installers, claiming to provide "unmatched service and diverse selection of vetted products, including modules, inverters, racking, balance of systems, and energy storage equipment for residential and commercial projects."

**2. Channel Inventory**

24. For a manufacturer, like Enphase, using distributors, "sell-in" represents the product a manufacturer such as Enphase sells to distributors. "Sell-through" represents the rate at which Enphase's distributors and installers sell its products to the end customer. "Channel inventory" represents products Enphase sells to distributors but that installers have not yet deployed. A strong sell-through generally benefits Enphase because its distributors must reorder to replenish inventory. This supports the manufacturer's revenue, production volume, margins, and cash flow.

25. By contrast, weak sell-through can portend and produce several effects. It may indicate that distributors will reduce new orders while using existing inventory. In addition, as sell-in falls below end-customer demand, weak sell-through likely requires channel destocking until excess inventory is cleared. Weak sell through can also pressure a company's margins, as it may cause the company to offer discounts or incentives to accelerate sales. More, weak sell-

through may require a manufacturer to adjust production to avoid inventory accumulation. This is especially so where product innovation or upgrades are frequent.

26. Weak sell through may also belie otherwise strong reported revenue. A company may initially report strong revenue, shipping substantial inventory into its distribution channel even though end-customer demand is weak. The revenue it books, therefore, may be materially less sustainable that the company's revenue suggests. Manufacturer shipments exceed sell-through. Distributor inventory rises. Distributors reduce subsequent orders. Manufacturer revenue falls—potentially below actual end-market demand—during destocking. Conversely, revenue can temporarily understate demand while distributors are reducing inventory. Analysts therefore compare reported revenue with sell-through data, distributor inventory levels, end-market installations, and management's discussion of channel inventory.

27. About revenue recognition, the 2024 10-K stated that Enphase "generate[s] revenues from sales of our solutions," listing the microinverters, storage solutions, software, and services its sells. "We generally sell our products to our customers," Enphase continued, "pursuant to a customer's standard purchase order and our customary terms and conditions. ***We do not offer rights to return our products other than for normal warranty conditions, and as such, revenue is recognized based on the transfer of control***. That is, even if Enphase properly recognized revenue after transfer of control, that sell-in provided an incomplete picture of both historic and likely future financial health of the company. Investors focused both on channel inventory levels and sell-through to understand Enphase's present and near term financial prospects.

**3. Pre-Class Period Disclosures Concerning Channel Inventory**

28. Defendants publicly disclosed their focus on channel inventory. For example, on October 22, 2024, Defendants convened an earnings conference call to discuss results from the period ended September 30, 2024 ("3Q2024 Call"). During the 3Q2024 Call, in prepared remarks, Defendant Badri stated with respect to sell-through:

> [l]et's now cover the region. Our US and international revenue mix for Q3 was 75% and 25% respectively. For more visibility into our business, we will be

> providing regional breakdowns for Q3. In the US, our revenue increased 43% compared to Q2. The overall sell-through of our products in the US was up 6% across all channels in Q3 compared to Q2. This increase was despite a large US customer declaring bankruptcy in Q3. Our distributor sell through in the US was up 13% compared to Q2, which reflects improving market fundamentals in the US. ¶ In California, our distributor sell-through was also up 13% in Q3 compared to Q2. In Q3, we saw healthy growth for both microinverters and batteries in California. NEM 3.0 now represents approximately 65% of California installs, and the attach rate of our own batteries continues to be close to 50%. In non-California states, our distributor sell-through was up 14% in Q3 compared to Q2. Looking ahead, we see lower interest rates, ITC adders, and higher power prices as the key drivers for 2025 growth.

29. Defendants tied channel inventory and sell-through with respect to 4Q2024 guidance. During the 3Q2024 Call, with respect to 4Q2024 guidance, Defendant Badri stated, "[w]e are guiding revenue in the range of $360 million to $400 million. We anticipate incremental improvement in our US business and a continued slowdown in Europe in Q4. We are approximately 85% booked to the midpoint of our overall revenue guidance very similar to last quarter." Defendant Badri continued, "[w]e expect to ship between 140 to 160 megawatt hours of IQ batteries in Q4. ***Our battery sell-through is doing well***. It continues to increase and we expect Q4 to reflect a slight uptick in demand."

30. Defendants also provided investors with context with respect to the meaning of "normal" channel inventory. During the 3Q2024 Call, in colloquy with Barclay's analyst Christine Cho, Defendant Badri described optimal channel inventory. Analyst Cho asked:

> Thank you. Good evening. I guess I just wanted to start on the batteries. You mentioned that you expect sell-through to be up slightly for batteries in the US quarter-over-quarter. But shipments are down because you restock during the quarter. ***Can you give us a sense of what sell-through was in 3Q? Is the 4Q guide more in-line with what sell-through levels actually are***? And if we could get a rough split of the shipments, going to the US versus everywhere else?

31. In response, with respect to healthy channel levels, Defendant Badri stated:

> Yes. I mean -- so basically, we actually told you 90 days ago that the channel on batteries is light, and we are going to get the channel to a healthy level. We have fixed that problem now. So therefore, basically, our -- you should think of our shipments into the channel and the shipments out of the channel are at equilibrium, which is there the same. So that's why that number of 140-megawatt to 160-megawatt hours. And you should think of our US roughly in-line with a revenue split up, which is the [75-25] (ph), you should think about a similar split up for batteries.

32. Following up, analyst Cho stated, "revenue was up 43% quarter-over-quarter in the US, I think you said and sell-through is something in the single digits across all channels." Cho asked, "[s]o was the disconnect here all the batteries as we just kind of mentioned? Or is there any restocking here on the MI side? And then just as we think about Europe as well, it sounds like your sell-through was worse than what your sell-in was there." Cho concluded, asking "[s]o maybe weeks of inventory went up there? And I guess, how should we assume what you are assuming for 4Q?"

33. Responding, Defendant Badri that normal channel inventory levels were 8 to 10 weeks, stating, "[s]o maybe the reason why our revenue increased by 43% is quite simple. ***We stopped under shipping in Q3***. So therefore, our revenue increased to normal level." Defendants Badri continued:

> [***s***]***o basically, we are now at a place where in the US, we are at equilibrium, sell-in and sell-through are matching***. And that's how we can maintain a healthy weeks on hand. For us, ***a healthy weeks on hand always means between 8 weeks to 10 weeks and not crossing that number -- 10 weeks number, which we have instituted the discipline***." So that's why you can see that the revenue increased 43%. That's the sell-in revenue.
>
> Now the good news in the US is our overall sell-through across all the channels, both distribution channel and direct channel was up 6% in Q3 compared to Q2. And I said, this increase was despite a very large US customer declaring bankruptcy in Q3. If you just look at our distribution channels, our sell-through for both -- for the US was up 13% and our sell-through in California, as well as outside California was up at similar levels at 13% and 14%, respectively. And in general, the sell-through is healthy across both microinverters and batteries.
>
> Coming to Europe. In Europe, it is a slightly different story. Our revenue was down because once again, we have learned the discipline when our overall sell-through products are down by 34%, we have to react. We have to react. We have shortened that cycle quite a bit compared to what happened last year. So we continue to under ship in Europe even with this reduced sell-through. And so our weeks on hand in Europe is a little bit high, but we are extremely disciplined and the moment when things turn around, our weeks on hand will come down very quickly. And we are not worried about that. We are cautious for Q4, this is why our guidance incorporates a slowdown in Europe in Q4, and we are not pushing more into the channel."

34. Not only did Defendant Badri establish the meaning of "normal" channel inventory, but he disclosed that he personally monitored sell-through rates. During the 3Q2024

Call, for example, Defendant Badri engaged in colloquy with JP Morgan analyst, Mark Strouse who asked:

> Good afternoon. Thanks for taking our questions. Going back to RE+, we were hearing quite a bit of optimism looking into 2025, just kind of based on a view that interest rates would be lower. Since then, there's been a pretty big spike in rates in the wrong direction. Just kind of curious, to the extent that you've had kind of very recent conversations with some of your customers, if that's creating any pause in the industry?[2]

35. Defendant Badri responded, "Well, I mean, our data -- as I told you, our sell-through data for Q3 things are headed in the right direction in the US. California, for example, we talked about NEM 3.0 being a drag that is no longer the case." Defendant Badri continued, "[i]nstallers have gotten used to NEM 3.0 -- at least some of installers have gotten used to NEM 3.0, and they are finding both solar plus storage working out in terms of economics. Outside the U.S. -- I mean, outside California also our sell-through data looks fine. We are up about 14%." Critically, Defendant Badri stated, "***I've been monitoring since the six weeks of RE+***, our sell-through data as things are looking better, week on week. And we do have -- we think things will be incrementally better in 2025 in the U.S. market."

36. His avowed familiarity with this data, however, was not limited to the six weeks after the 2024 RE+. During Enphase's April 23, 2024, earnings conference call for the Period ended March 31, 2024 ("1Q2024 Call"), Defendant Badri stated that he participated in weekly "ship review" meetings involving detailed discussions concerning sell-through, sell-in, and channel inventory. During the 1Q2024 Call, Defendant Badri stated, "our ship review every Wednesday, we have exactly the graph, how much is our sell-through? How much is our sell-in? Should we really do so much of sell-in? Are we going to stay within the guardrails, which is eight to 10 weeks?"

37. As the Class Period approached, Defendants further discussed sell-through with investors. During the 3Q2024 Call, Goldman Sachs analyst Brian Lee asked questions about the Company's 4Q2024 guidance, stating, "you're flat for 4Q. I think there's three drivers, right, Battery Storage, Europe and SunPower. You gave us the guidance for battery storage. That seems

[2] "RE+" bills itself as the largest and most comprehensive clean energy event in North America.

like it's a $15 million headwind. And then Europe was a $5 million to $10 million drag in 3Q." Based on that guidance, analyst Lee asked, "[i]Is it similar in 4Q? Because you're saying it's going to be down. And then SunPower might have been doing less than 50 megawatts a quarter at the end of their existence, but that's still $10 million to $15 million of revenue for you." Analyst Lee continued, "[s]o really, the question is, can you help kind of quantify what seemed to be three meaningful buckets of headwinds for at least the sequential growth into 4Q?"

38. Responding, Defendant Badri stated:

> "Yes. In Q4, our overall sell-through of microinverters is doing a little better -- is doing a little better compared to Q3. And we can see that, and that's what we are guiding towards. And as I told you on the battery side, it is -- we are talking about 140-megawatt to 160-megawatt hours versus the 170-megawatt hours. That's -- you're right in the range that you said. SunPower is a headwind of $10 million to $15 million. You are correct about that. And we don't expect that to immediately come in Q4, but we are working with all of the installers, and we should be able to get all or most of that in the coming quarters. ***So to answer your question, we expect upside from increased microinverter sell-through. The battery sell-through is also doing fine, except for that one-time channel destocking***. And Europe has got a slightly continued weakness compared to Q3.

39. Following up, analyst Lee stated:

> Yes, that's super helpful, Badri. Second question on that same line of thought, you strip up the battery storage, microinverter sales, you're saying are going to be up about 5% or so in the 4Q guide at the midpoint. But I would have thought stripping out all these other factors like SunPower, Europe, et cetera, you have US seasonality, US domestic content. And also, it sounds like you had some price increases in the US. So can you talk us through some of the tailwinds that I don't know, if they're actually showing up in 4Q or if they are going to show up later. But I would have expected those to maybe help you a bit more into 4Q outside of all these other headwinds we just talked about. So domestic content, US price increases. Just any general thoughts around that? Thank you guys.

40. Responding, Defendant Badri stated, "[y]es, we are not increasing any prices in the US. The domestic content product is a new product and that for increased domestic content, yes, there is an extra adder. And we do have -- we do expect, like what you said, we think those are the drivers." He continued, "[t]he increased domestic content is a driver. The sell-through on microinverters, is a driver." With respect to batteries, Defendant Badri continued, "[b]atteries, it's going to be generally strong, and I think we expect to be even stronger from Q1 '25 when we have our fourth generation system. So that piece. Yes, but you're generally right," concluding, "[t]he

way I would characterize it as -- if microinverter is a little bit healthy, it covers the other areas which are weak."

41. Warning generally about risks related to the Company's financial condition and liquidity, the 2024 10-K stated, "[i]f we do not forecast demand for our products accurately, we may experience product shortages, delays in product shipment or excess product inventory, any of which will adversely affect our business and financial condition."

42. Defendants stated unequivocally that they followed channel inventory closely. For example, during Defendants' February 4, 2025, earnings conference call for the quarter ended December 31, 2024, ("4Q Call"), responding to a question about the health of installers. Defendant Badri stated that Enphase sold primarily to distributors who were "reasonably healthy." Continuing, he stated "[w]hile ***Enphase manages the channel inventory closely***, I mean, installers do -- are having a difficult time. There is no question. There is no question that installers are having a difficult time. There is cash flow to installers is always a problem, right."

**B. Competition**

**1. The Company Acknowledges that the Solar Industry is Highly Competitive**

43. In the 2024 10-K, Defendants described the solar industry as "highly competitive, stating:

> ***The markets for our products are highly competitive*** and we compete with central and string inverter manufacturers, storage system manufacturers and new technologies that compete with our business. The principal areas in which we compete with other companies include: product performance and features; total cost of ownership; breadth of product line; local sales and distribution capabilities; module compatibility and interoperability; reliability and duration of product warranty; technological expertise; brand recognition; customer service and support; compliance with industry standards and certifications; compliance with current and planned local electrical codes; integration with storage offerings; size and financial stability of operations; size of installed base; and local manufacturing and product content.

44. With respect to competition, the 2024 10-K stated, "The markets for our products are highly competitive and we compete with central and string inverter manufacturers, storage system manufacturers and new technologies that compete with our business." Among the

principal areas in which Enphase competed were product performance and features, total cost of ownership, breadth of product line, module compatibility and interoperability, and integration with storage offerings. About these areas of competition, the 2024 10-K described:

> In an installation consisting of a traditional central inverter, the solar PV modules are connected in series strings. In a large installation, there are multiple series strings connected in parallel. The aggregated voltage from each of these strings is then fed into a large central inverter. We believe that traditional string inverters have a number of design and performance challenges limiting innovation and their ability to reduce the cost of solar power systems, including the following:
>
> - Productivity limits. If solar modules are wired using a traditional central inverter—a group or "string" of modules are wired in series, and an entire string's output is limited by the output of the lowest-performing module. Because of its string design, there is a single point of failure risk with the traditional string inverter approach.
>
> - Reliability issues. Traditional string inverters are the single most common component of solar installations to fail, resulting in system downtime and adversely impacting total energy output. As a result, string inverters typically carry warranties of only 5 to 12 years.
>
> - Complex design and installation requirements. The string inverter-based solar PV installation requires greater effort on the part of the installer, both in terms of design and on-site labor. String inverter installations require string design and calculations for safe and reliable operation, as well as specialized equipment such as DC combiners, conduits and disconnects. In addition, the use of high-voltage DC requires specialized knowledge and training and safety precautions to install string inverter technology.
>
> - Safety issues. String inverter solar PV installations have a wide distribution of high-voltage (600 volts to 1,000 volts) DC wiring. If damaged, DC wires can generate sustained electrical arcs, reaching temperatures of more than 5,000°F. This creates the risk of fire for solar PV installation owners and injury for installers and maintenance personnel.
>
> These challenges of traditional string inverters have a direct impact on the cost and expected return on investment of solar installations to both installers and system owners:
>
> - Installer. Solar PV installers aim for simple installation design, fast installation times and maximum system performance and predictability. The installation of high-voltage DC string inverter technology, however, requires significant preparation, precautionary safety measures, time-consuming string calculations, extensive design expertise and specialized installation equipment, training and knowledge. Together, these factors significantly increase complexity and cost of installation and limit overall productivity for the installer.
>
> - System Owner. Solar power system owners aim for high energy production, low cost, high reliability, and low maintenance requirements,

> as well as reduced fire risks. With traditional string inverters, owners often are unable to optimize the size or shape of their solar PV installations due to string design limitations. As such, they experience performance loss from shading and other obstructions, can face frequent system failures and lack the ability to effectively monitor the performance of their solar PV installation. In addition, string inverter installations operate at high-voltage DC, which bears significant fire risks. Further, due to their large size, string inverter installations can affect architectural aesthetics of the house or commercial building.

Several of our existing and potential competitors are significantly larger than us and may have greater financial, marketing, distribution and customer support resources and may have significantly broader brand recognition, especially in certain markets. In addition, some of our competitors have more resources and experience in developing or acquiring new products and technologies and in creating market awareness for these offerings.

45. The 2024 10-K provided a list of Enphase's competitors by product types, stating, "[c]ompetitors in the inverter market include, among others, SolarEdge Technologies, Inc. ("SolarEdge"), Huawei Technologies Co. Ltd., ("Huawei"), Tesla, Inc. ("Tesla"), Sungrow Power Supply Co., Ltd., Growatt New Energy Co., Ltd and other companies offering microinverters and/or string inverters with and without solar optimizers. We believe" Defendants continued, "that our microinverter solutions offer significant advantages and competitive differentiation relative to traditional central or string inverter technology, even when supplemented by DC-to-DC optimizers on the roof." With respect to storage, the 2024 10-K continued, "[c]ompetitors in the storage market include Tesla, SolarEdge, Huawei, BYD, Franklin Solar Battery and other producers of battery cells and integrated storage systems. Competitors in the EV charger market include Wallbox, ChargePoint Holdings, Inc., Tesla, JuiceBox and EVBox, among others."

### 2. The Company Warns of the Material Risks From Competition

46. More, the 2024 10-K and the subsequent periodic reports incorporating it by reference, included a risk warnings about competition, stating:

> ***The solar industry is highly competitive, and we expect to face increased competition as new and existing competitors introduce products or develop alternative technologies, which could negatively impact our business, financial condition and results of operations.***
>
> We compete primarily against central and string inverter manufacturers, as well as against new solutions and emerging technologies that directly compete with our business. A number of companies have developed or are developing

microinverters and other products that will compete directly with our solutions in the module-level power electronics market. We also compete against manufacturers of energy storage systems and EV chargers for our solutions in these markets.

Competitors in the inverter market include, among others, SolarEdge, Huawei, Tesla, Sungrow Power Supply Co., Ltd., Growatt New Energy Co., Ltd and other companies offering string inverters with and without solar optimizers. Competitors in the storage market include Tesla, SolarEdge, Huawei, BYD, Franklin Solar Battery, and other producers of battery cells and integrated storage systems market. Competitors in the EV charger market include Wallbox, ChargePoint, Tesla, JuiceBox and EVBox, among others.

Several of our existing and potential competitors are significantly larger than we are and may have greater financial, marketing, distribution and customer support resources and may have significantly broader brand recognition, especially in certain markets. In addition, some of our competitors have more resources and experience in developing or acquiring new products and technologies and creating market awareness for these offerings. Further, certain competitors may be able to develop new products more quickly than we can and may be able to develop products that are more reliable or that provide more functionality than ours. In addition, some of our competitors have the financial resources to offer competitive products at aggressive or below-market pricing levels, which could cause us to lose sales or market share or require us to lower prices of our products in order to compete effectively. Suppliers of solar products, particularly solar modules, have experienced eroding prices over the last several years and as a result many have faced margin compression and declining revenues. If we have to reduce our prices, or if we are unable to offset any future reductions in our average selling prices (“ASPs”) by increasing our sales volume, reducing our costs and expenses or introducing new products, our revenue and gross profit would suffer.

Significant developments in alternative technologies, such as advances in other forms of distributed solar PV power generation, storage solutions such as batteries, the widespread use or adoption of fuel cells for residential or commercial properties or improvements in other forms of centralized power production may have a material adverse effect on our business and prospects. Any failure by us to adopt new or enhanced technologies or processes, or to react to changes in existing technologies, could result in product obsolescence, the loss of competitiveness of our products, decreased revenue and a loss of market share to competitors.

We also may face competition from some of our customers or potential customers who evaluate our capabilities against the merits of manufacturing products internally. Other solar module manufacturers could also develop or acquire competing inverter technology or attempt to develop components that directly perform DC-to-AC conversion in the module itself. Due to the fact that such customers may not seek to make a profit directly from the manufacture of these products, they may have the ability to manufacture competitive products at a lower cost than we would charge such customers. As a result, these customers or potential customers may purchase fewer of our systems or sell products that compete with our systems, which would negatively impact our revenue and gross profit.

### 3. Material Competition from Telsa's Powerwall 3

47. With Powerwall 3 ("PW3"), Tesla, Inc. ("Tesla") redesigned the Powerwall rather than simply increasing the capacity of Powerwall 2. The legacy Powerwall 2 complemented Enphase's sales, enabling a customer to purchase solar panels, Enphase microinverters, and Tesla Powerwall 2 as the storage solution. Even if a customer selected Powerwall 2 as its storage solution Enphase could still sell that same customers microinverters. PW3, however, materially altered the competitive relationship between Tesla and Enphase.

48. PW3's most consequential innovation was combining a 13.5-kWh battery, a high-power battery inverter, and a solar inverter in one product. That architecture made PW3 particularly compelling for new residential solar-plus-storage installations, putting it in direct competition with Enphase's combination of IQ microinverters and IQ batteries. The breakthrough was primarily power electronics, integration and installation economics, rather than simply putting more battery cells into the box. A conventional residential solar-plus-storage installation requires solar panels channeling energy through solar inverter/microinverters, into electrical equipment, then to a battery inverter, and ultimately into battery storage. Tesla designed PW3 so that solar panels can feed DC electricity directly into the Powerwall's integrated solar inverter, simplifying solar energy conversion—solar panels to PW3 to the home or grid. With this simplification, Tesla and PW3 provided a powerful economic proposition for acquiring solar panels and storage simultaneously with fewer separate components, less wiring, less equipment to install and potentially less installation labor.

49. In 2024 and 2025, Enphase took essentially the opposite architectural approach. With Enphase, each solar panel normally has an Enphase microinverter converting DC to AC at the module level. The IQ Battery is then an AC-coupled battery incorporating additional Enphase power electronics. Even as that distributed architecture may have advantages—including module-level optimization, redundancy, monitoring, flexible system design and compatibility with existing Enphase solar installations—it meant a new solar-plus-storage installation can contain considerably more power-electronics hardware. PW3, therefore, provided cost savings,

eliminating the need to purchase a microinverter for every solar module and separate battery power electronics. PW3's integrated device performed the central solar-inverter and battery functions in one product.

50. Regardless of the possible advantages of Enphase's more complicated architecture, installers and end users concerned with total installed costs were attracted to PW3 upon its first sale. Rather than simply comparing a Tesla battery to an Enphase battery, installers and end-users compared Tesla's integrated solar and battery architecture with Enphase's microinverter and battery architecture. PW3 bundled functionality for which the competing Enphase system required multiple pieces of equipment. According to EnergySage, for the first half of 2024—even as actual installed prices varied materially by installer, system configuration and location—estimated median battery-brand pricing was at approximately $1,000/kWh for PW3 versus $1,344/kWh for Enphase.

51. Tesla released PW3 in September 2023 but began selling it broadly in 2024. Greentech, on information and belief likely Enphase's largest customer, began distributing PW3 in 2024.

52. By May 2024, major installer SunPower Corporation ("SunPower"), on information and belief a material Enphase customer,[3] added PW3 to its product offerings. As this occurred the U.S. residential solar market weakened materially. According to Defendant Badri's April 4, 2025, Annual CEO Letter for 2024 ("2024 CEO Letter"), "[t]he solar industry, like many sectors tied to long-term investment and policy, was hit hard by rising interest rates, shifting regulations, and declining consumer confidence." As those factors increased cost, Tesla introduced PW3 into a shrinking market, turning Tesla from principally a supplier of a battery that could coexist with Enphase microinverters into a supplier of an integrated solar-and-storage architecture that could replace both Enphase's battery and its microinverters on a new installation, with materially better system integration, power, and installation economics. PW3 was a major

[3] On September 30, 2024, Complete Solaria, Inc. acquired certain SunPower assets. Complete Solaria subsequently rebranded as SunPower effective April 22, 2025.

competitive concern, materially impacting Enphase's sell-in, its sell through, and, therefore, its channel inventory.

53. In their public disclosures, Defendants, however, all but ignored PW3 and its impact on Enphase's channel inventory and its sales. For example, during the 3Q2024 Call, in prepared remarks, Defendants did not address competition or PW3 at all. About PW3, Defendants fielded a question from Philip Shen of Roth Capital Partners. Shen asked:

> Shifting to Powerwall 3 and Tesla. ***Our work suggests that the Powerwall 3 demand is substantial and widespread***. I know it is a string inverter, and I know and you just laid out how your technology is meaningfully better and more advanced. That said, I know many of your customers are ramping up ***substantial Powerwall 3 volumes. So when you talk to your customers about that, what are they telling you? And then are you surprised by the volume of business that is shifting to Powerwall 3? Some of your larger customers are sharing with me that you may be resigned to losing share to Powerwall 3, especially until your new battery and meter collar and combiner box comes out. How much do you think -- how much are you planning to lose***?

54. In response, Badri denied the impact of PW3 on Enphase's sales and channel inventory, stating:

> Yes. So thank you for the question. The key -- I can react to data in front of me, all of the data which we have continuously, ***we do have third-party reports***. ***And we -- those all show basically that we are holding share***. That's the data point number one. And the second point, which we highlighted is basically ***our sell-through in California***, which is probably the area where you're talking about. ***Our sell-through in California is up 13% quarter-on-quarter***. And our sell-through is up on both batteries and microinverters because they go hand-in-hand with each other. And on batteries, as I told you before, our installs, if you see our installations in California, and it makes sense, is 70% of our installs are grid-tied installs in California. The 70% are grid-tied installs like what I said, the cost that you are talking about is not -- is not higher.
>
> The cost, in fact, it is cheaper to install an Enphase battery there. We are talking about two 5P batteries. We are talking about hanging it off the AC bus. We have the same combiner box that is used, so it's not an extra box. So that is why probably our market is grid-tied market. And now we are in the process of fixing that problem. And we are going to release in the first quarter, the latest and greatest battery that we got. That's a 10-kilowatt hour battery. That 10 kilowatt-hour battery has got a wall space of 60% lesser compared to our own battery. And there is no system controller that used to be there before. Now there is the color. We expect -- the color is done development. It is in compliance. We expect to work with utilities in the next few months and get utility approval in Q1 '25.
>
> So with the color -- with our battery, which has got neutral farming, by the way, and our enhanced combiner, which has got a lot of bells and whistles that are

installers love. The cost of the installation is substantially going down by $300 per kilowatt hour for a typical storage system with backup. So basically, we have solved that problem. We need to get that solution to the market in Q1 '25. And then what will happen is we will grow in both grid-tied markets, as well as markets with back up. And that will be a key focus for us in 2025 and will contribute to growth.

The other things, which you already know, but I will tell for the benefit of the audience is Enphase, the advantages are numerous, power production. Power production -- between power production with the string inverter and power production with the microinverter, you can get anywhere from 4% to 15% advantage, especially where there is shading, which is there in many places. With Enphase that is reliability. There is no single point of failure. When a microinverter on the roof fails, we still have 95% of the system working, assuming the system has got 20 microinverters. When a microinverter inside the battery fails, we still have 83% of the system working. Every IQ battery has got six microinverters. So reliability and no single point of failure. Our warranty is -- warranty on batteries is 15 years. Warranty on microinverter is 25 years versus common warranty of 10 years on string inverters.

Simplicity, plug-and-play, is just very easy to do on the roof. Low-voltage DC on batteries. And obviously AC in the roof loved by firefighters. I've had many firefighters telling me and FEMA by the way, which is basically the authority in the US. They do recommend microinverters because of that. So other things, 24x7 support. If there is a problem, Enphase will answer the phone. We never take batteries off the wall. We repair them, replace boards in situ. In situ means we do not -- customer is not down for more than a few days versus being down for weeks and having complex logistics between the supplier and install. All of that doesn't happen. Serviceability is very crucial. When you have a fleet of batteries and you have service problems, you keep spending your time on service. You know, you made a mistake in taking an architecture. And by the way, batteries are notorious for this. Inverters, solar inverters, the industry is getting matured, but batteries is still Wild Wild West.

AC architecture. We believe in a distributed architecture, which as I already told you, no single point of failure, all AC. Everything is AC coupled. We have our solar, our storage, our EV chargers, our bidirectional chargers, anything is AC coupled. So basically, the power that a homeowner gets, for example, is both solar plus storage. So I outlined all of the things that those are our strengths, plus with the fourth generation system, we are going to be very competitive on backup. And we expect all of these to basically increase our market share on batteries going forward.

55. More, on February 4, 2025, Defendants convened an earnings call to discuss Enphase's 4Q2024 results ("4Q Call"). During the 4Q Call, GLJ Research analyst Gordon Johnson asked Defendants, about "the specific data for the California solar initiative." According to Johnson, "it shows Tesla Powerwall gaining significant share in the storage space and then also taking share in the inverter space." About that, Johnson asked, "I just wanted to know if you guys

are still seeing those trends continue or you're taking share back from them?" Effectively ignoring PW3's market share capture, Defendant Badri responded, touting Enphase's products, stating:

> Yes. ***Like what I said, we don't comment on competition***. We are focused on making best-in-class products. We had talked about our battery being very popular for grid tide applications in California. With the fourth generation product, we will not only be best-in-class for cryptite [ph], we will also be best-in-class for backup. And that has been one of our limitations until now. And we are going to unleash or unblock that limitation very, very soon. So, we are excited there.
>
> Our batteries are modular batteries, so you don't need to buy 13 or a 26-kilowatt hour, you hour, you can buy 15-kilowatt can buy 20. So, ours is a modular solution. And it will be very cost-effective.
>
> Now, coming on the micro side, I talked about it extensively in prior calls, the value proposition of our microinverters are superior power production, shading -- it all comps, meaning shading usually can cause a power production that is dramatically lesser microinverters optimize at the per panel level and therefore, able to really maximize the energy production and then single point of failure, a 25-year warranty versus warranty versus a 10-year warranty from competition. By the way, on batteries, we do 15-year a 10-year warranty from competition.
>
> Service ability is a big deal. When you have a monolithic structure in the battery and you have to replace your entire battery. It's tough to do that. It is -- it results in weeks and months of nonperformance for the homeowner. Ours comes with serviceability. I'm proud to say 95% of the issues in our battery systems can be solved in situ.
>
> In situ means our field service goes and he just replaces a $40 board instead of taking a $5,000 battery of the wall. And so we have numerous advantages in terms of modularity, simplicity, warranty, safety and serviceability.
>
> And then the other two things which I talked about, which are not to be discounted the ones we introduced in Q4, we produced something called as a Busbar PCS, Busbar Power Control Software.
>
> Busbar Power Control Software helps in eliminating main panel upgrades, 95% of the time. And so our installers are very happy with that. They are starting to use that for every design and it maximizes the ability or it maximizes the size of the solar plus storage system.
>
> Similarly, one more thing that we introduced another big deal is as users they have higher consumption, because they bought an EV or something. They want to expand their legacy systems. We basically provide them a very simple solution once again with power control software.
>
> Our Enphase power control software enables you to do expansion without losing the benefits of your legacy system. So we introduced that also in the fourth quarter. So lot of benefits working with Enphase, most important, we will take care of our installers. And if there is any shortage supply shortage, they can call us to take care of them.

56. During the 4Q Call, in colloquy with Jeffries analyst Julien Dumoulin-Smith, Defendants again deflected, avoiding directly answering the headwind related to PW3 and its attractive pricing and capabilities relative to Enphase's product offerings. Domoulin-Smith asked:

> Hey. Good afternoon, team. Thank you guys very much. Appreciate the time. Maybe just following-up on the last viewer's questions. I know it a little bit early to guide shall we say. But obviously, you've got a number of tailwinds here when you think about the IQ9 coming in the back half, also fourth gen introduction.
>
> In theory, you guys have alluded to potentially higher margins, maybe 60% of these new products, 45% of fourth gen maybe or upwards of. I mean, as you think about those products leading into the back half of the year, can we expect a margin uptick.
>
> I noticed obviously in 1Q here, there's a little bit of a downtick here versus what you guys just put up. Is there a mix dynamic in 1Q? And really, as you think about the back half of the year, as those new products roll in, are there any offsets that you would otherwise see?
>
> And then related, is there a pricing dynamic that we should be watching as it pertains to the updated IRS cost allocation tables for MLPs, right? I know that dropped here from 36% to 25% of late. Does that change anything in the pricing and up-pricing potential we might have seen earlier?
>
> And could that be a headwind itself? Or conversely, ***could maybe the dynamics around Powerwall 3 and the separation between the solar qualification versus the battery piece helped drive incremental sales and stabilize backdrop a little bit***. Sorry, a lot in there, but I wanted to squeeze it all in.

57. In response, Defendant Badri stated:

> Yes. Our pricing strategy is quite simple. We price on value added with respect to competition. We also have a very robust world-class cost program. So, I keep getting this question all the time in the last six years. My answers are the same. We have a pricing team. We have a cost team. We make excellent progress on both.
>
> And we basically -- if we need to drop price on batteries, because we don't add that much value, we will, at the same time, we work on cost reduction opportunities. And the results prove that today, we are at a non-GAAP gross margin without the IRA benefit, we are reporting approximately 39.7%. The number for Q1, the guidance we gave is between 38% and 41%, you should just interpret that as regular product mix that is fluctuating. So our numbers will fluctuate.
>
> Do I expect us to get better? I do expect us to get better in general. I do expect us to improve. For example, IQ9 brings in a lot of tricks with gallium nitride. We are able to go from four silicon fabs to two gallium nitride fabs. And because we are using what is called as a bidirectional switch instead of four unidirectional switches, we will now use two bidirectional switches. Therefore, there is some intrinsic cost reduction.

> We expect to be running those FETs at a frequency that is greater than 100 kilohertz in the future. And when you run those FETs at a greater than 100 kilohertz in the future, you longer need a big transformer. For example, if you are able to run them at 10 times higher frequency, from 100 kilohertz, if you're able to run at 1 megahertz, you should be able to get a transformer reduction by 1 over route 3, which is a 66% reduction in the transformer size.
>
> While we are not there, our -- I mean, we call that as internally as moonshot so that we can gain that benefit and give customers ultra small inverters, we are extreme -- which are extremely cost competitive. So it will help both customers as well as us in terms of gross margin.
>
> On the fourth-generation battery, we have excellent levels of integration. and that is about to come in imminently. On the fifth-generation battery, which we are working on, we expect to release our fifth-generation, I haven't talked about it too much, but we are always working on N and N+1.
>
> So, our fifth-generation battery will come out in Q1 2026, one year from today. And that also has got a drastic cost reduction associated with it. I'll give you more highlights on that in the next call on why. That will use prismatic cells. It's got an energy density that is 50% higher. We'll share more details.
>
> So, in general, we are making advances in our products that fundamentally improve the cost structure. So while we will price attractively price based on value that we add to the end customer, we expect our cost to get continuously better. And the combination of which will result in a steady uptick in gross margins for us.

58. Thus, by early February 2025, investors were aware of a weakening market and macro-economic factors like the potential impact of tariffs and possible regulatory changes depressing sales. While investors were aware of the potential impact of Tesla's PW3 on Enphase's sales and, in turn, its channel inventory, however, Defendants failed to disclose the true material impact of PW3. Throughout the Class Period, in the context of affirmative statements about the impact of regulatory changes and other macro factors on Enphase's channel inventory, Defendants omitted the truth—that Tesla's PW3 had materially undercut Enphase's sales leading to a glut in channel inventory.

### C. Defendant Badri Attends Quarterly Sales Meetings at Which Defendants and Other Enphase Personnel Discussed the Material Adverse Impact on Enphase's Sales and Channel Inventory

59. Former employee 1 ("FE1") worked for Enphase as a Regional Sales Manager in Southern California from 2020-2022, and then as a Regional Sales Manager in Florida from 2022

through March 16, 2026. In California, FE1 Reported to Senior Sales Director Ryan Stepp, and in Florida to Senior Sales Director Scott Cicora.

60. As part of his duties, FE1 regularly met with installers of Enphase batteries and microinverters. FE1 also met regularly with distributors to whom Enphase sold batteries and microinverters for ultimate sale to installers.

61. After Tesla began selling PW3 in earnest in February 2024, by late 2024, sales of Tesla's PW3 caused demand for Enphase's batteries dropped sharply, possibly by as much as 80%. Further, the introduction of the PW3 affected Enphase's channel inventory as demand for Enphase's batteries declined.

62. According to FE1, it was difficult for Enphase's battery to compete with the new PW3 because the PW3 provided greater storage capacity and capabilities at a significantly lower price. Further, the PW3 was easier for installers to install, more reliable than Enphase's batteries, and suffered fewer problems requiring repairs.

63. FE1 had multiple conversations with installers and distributors when the PW3 entered the market. Those installers told FE1 that they were shifting to the Tesla product, and that the installers considered it a better material value. Specifically, according to FE1, the PW3 allowed installers to lower homeowner pricing while preserving their own margins.

64. FE1 also participated in management discussions and quarterly sales meetings where, among other things, market analysis and competitor performance were discussed. CEO Badri appeared at and spoke at each quarterly sales meeting. At these meetings, the materially lower demand for Enphase's batteries, and great demand for the PW3, was discussed. The PW3 was identified as Enphase's largest competitor, with discussions around pricing, product advantages, and market share.

65. FE1 states that as 2025 progressed, the decline in demand for Enphase's batteries continued, and indeed worsened throughout the year. FE1 also saw distributor data that confirmed this trend. FW1 states that in Q2 and Q3 of 2025, Enphase's battery sales were weak.

66. According to FE1, Enphase's difficulties with battery sales stemmed from two separate forces. First, a weakening solar market, with some installers going out of business, as well as the loss of the 25D tax credit as of January 1, 2026, NEM changes resulting in lower homeowner compensation for exported electricity, and higher interest rates. Second, and separately, direct competitor pressure from Tesla's PW3 cut greatly into Enphase's sales, market share, and affected its channel outlook.

67. Thus, as Defendants disclosed to investors "normalized" channel inventory and the impact of regulatory factors and interest rates on Enphase's results, Defendants knew or recklessly disregarded that competition from PW3 was materially impacting Enphase's sales such that normal channel inventory was materially and acutely elevated during the Class Period.

## V. FALSE AND MISLEADING STATMENTS

68. On February 4, 2025, at approximately 4:00 p.m. Eastern Time, Defendants issued a press release for the quarter and year ended December 31, 2024, summarizing Enphase's 4Q2024 results and guiding for 1Q2025. Under the heading "strong U.S. manufacturing," Defendants stated that during 4Q2024, Enphase "shipped 1.69 million microinverters and 6.7 megawatt hours of IQ Batteries."

69. On February 4, 2025, at 4:30 p.m. Eastern Time, Defendants convened an earnings conference call to discuss the Company's 4Q2024 and annual 2024 results ("4Q Call"). During the 4Q Call, Defendant Badri stated that Enphase had "reported quarterly revenue of $382.7 million, shipped approximately 2 million microinverters and 152-megawatt hours of batteries and generated free cash flow of $159 million. ***Our overall channel inventory remained normal as we exited the fourth quarter***."

70. The foregoing statements about channel inventory remaining normal were materially false or misleading because Defendants knew or recklessly disregarded that in addition to macroeconomic and/or industry headwinds, by mid-2024, Telsa's introduction of PW3 materially eroded Enphase's market share and sales, creating a material glut of channel inventory no later than the start of the Class Period. In a contracting and volatile solar installation market,

with PW3's introduction, Defendants' claim that channel inventory was normal at eight to ten weeks misled investors as to both the current state of channel inventory and its impact on Enphase's future sales.

71. Later, during the 4Q Call, with respect to battery sales in the United States, Defendant Badri stated, "[o]ur battery sales were down 8% in Q4 compared to Q3 ***due to lesser channel restocking as we had previously anticipated***. Our overall sell-through of products was flat in Q4 compared to Q3. Concluding his prepared remarks, Defendants Badri stated, "[w]e successfully navigated a challenging 2024, generating strong free cash flow and profitability ***while bringing down channel inventory to normalized levels***. We entered 2025," he continued, "with a continued focus on operational efficiency product reliability, customer service, product breadth and geographic expansion.

72. The foregoing statements about bringing channel inventory down to normalized levels were materially false and misleading because Defendants knew or recklessly disregarded that in addition to macroeconomic and/or industry headwinds, by mid-2024, Telsa's introduction of PW3 materially eroded Enphase's market share and sales, creating a material glut of channel inventory no later than the start of the Class Period. In a contracting and volatile solar installation market, with PW3's introduction, Defendants' claim that channel inventory was normal at eight to ten weeks misled investors as to both the current state of channel inventory and its impact on Enphase's future sales.

73. After prepared remarks, Defendants fielded analysts' questions. In the context of the "California solar initiative," GLJ Research analyst Gordon Johnson stated that "it shows Tesla Powerwall gaining significant share in the storage space and then also taking share in the inverter space." In that context, Johnson asked, "[a]nd I just wanted to know if you guys are still seeing those trends continue or you're taking share back from them?" In response, Defendant Badri stated "[y]es. Like what I said, we don't comment on competition. We are focused on making best-in-class products. We had talked about our battery being very popular for grid tide applications in California. With the fourth generation product," he continued, "we will not only be best-in-class

for cryptite [ph], we will also be best-in-class for backup. And that has been one of our limitations until now. And we are going to unleash or unblock that limitation very, very soon. So, we are excited there." Defendant Badri' attempted deflection, however, did discuss competition in the context of Enphase's product offerings and planned product offerings.

74. The foregoing statements about Enphase's products in the context of competition from PW3 were materially false and misleading because Defendants knew or recklessly disregarded that in addition to macroeconomic and/or industry headwinds, by mid-2024, Telsa's introduction of PW3 materially eroded Enphase's market share and sales, creating a material glut of channel inventory no later than the start of the Class Period. In a contracting and volatile solar installation market, with PW3's introduction, Defendants' claim that channel inventory was normal at eight to ten weeks misled investors as to both the current state of channel inventory and its impact on Enphase's future sales.

75. On February 10, 2025, Defendants filed with the SEC the 2024 10-K. In the Management Discussion and Analysis ("MD&A") section of the 2024 10-K, Defendants discussed the impact of "Global Events Affecting our Business and Operations," stating:

> As we have a growing global footprint, we are subject to risk and exposure from the evolving macroeconomic environment, including the effects of increased global inflationary pressures, tariffs and interest rates, fluctuations in foreign currency exchange rates, potential economic slowdowns or recessions, geopolitical pressures and potential regulatory changes, including the unknown impacts of current and future trade regulations. We continuously monitor the direct and indirect impacts of these circumstances on our business and financial results.
>
> Demand for Products. The demand environment for our products experienced a broad-based slowdown beginning in the second quarter of 2023 in the United States and in the third quarter of 2023 in Europe that continued into 2024. This demand environment has negatively impacted several distributors and installers, resulting in reduced liquidity, bankruptcy and business closures, which has affected our revenue and profitability, days sales outstanding and allowances for credit losses. ***The slower demand environment also resulted in elevated inventory with distributors and installers in late 2023 and the first half of 2024, and as a result we sold fewer microinverters to distributors and installers during the year ended December 31, 2024 compared to the same period in 2023***.

> In the United States, this slowdown was primarily the result of higher interest rates, high channel inventory and the transition from NEM 2.0 to NEM 3.0 in California. Higher interest rates resulted in larger monthly costs and longer pay-back periods for those customers who financed their systems. In Europe, this slowdown was primarily driven by a softer customer demand as utility rates dropped and policy changes were implemented. This resulted in oversupply, financial stresses throughout the industry and the resulting channel inventory correction. In addition, there has been increased uncertainty in NEM policies and solar export penalties in a key European market. The phase out of NEM in that market was ultimately not approved but solar export penalties are still causing uncertainty among consumers. While ***we believe we have made the appropriate corrections to our channel inventory, some of the foregoing trends in the United States and Europe could continue to have an adverse effect on our results of operations in 2025***.

76. The foregoing statements about the reasons for elevated channel inventory and the appropriateness of Defendants "corrections" to channel inventory were materially false and misleading because Defendants knew or recklessly disregarded that in addition to macroeconomic and/or industry headwinds, by mid-2024, Telsa's introduction of PW3 materially eroded Enphase's market share and sales, creating a material glut of channel inventory no later than the start of the Class Period. In a contracting and volatile solar installation market, with PW3's introduction, Defendants' claim that channel inventory was normal at eight to ten weeks misled investors as to both the current state of channel inventory and its impact on Enphase's future sales.

77. Also in the MD&A section of the 2024 10-K, under the heading "Results of Operations," Defendants noted an overall decrease in revenues in 2024 from 2023, attributed the decrease in net revenues "to a broad-based slowdown that began in 2023 in both the United States and Europe. This resulted," the 2024 10-K continued, "in elevated inventory with distributors and installers, and as a result we sold fewer microinverters to distributors and installers during the year ended December 31, 2024 to normalize channel inventory, as compared to the same period in 2023. In the United States," the 2024 10-K continued, "***this slowdown was primarily the result of higher interest rates, high channel inventory and the transition from NEM 2.0 to NEM 3.0 in California***. Higher interest rates resulted in larger monthly costs and longer pay-back periods for those customers who financed their systems."

78. The foregoing statement about the slowdown in 2024 revenue and the reasons channel inventory was materially elevated was materially false and misleading because

Defendants knew or recklessly disregarded that in addition to macroeconomic and/or industry headwinds, by mid-2024, Telsa's introduction of PW3 materially eroded Enphase's market share and sales, creating a material glut of channel inventory no later than the start of the Class Period. In a contracting and volatile solar installation market, with PW3's introduction, Defendants' claim that channel inventory was normal at eight to ten weeks misled investors as to both the current state of channel inventory and its impact on Enphase's future sales.

79. About competition, the 2024 10-K stated, "[t]he markets for our products are highly competitive and we compete with central and string inverter manufacturers, storage system manufacturers and new technologies that compete with our business. The principal areas in which we compete with other companies include: product performance and features. . . ." Among the Company's competitors for both inverters and batteries was Tesla. Subsequently, in "Risk Factors," the 2024 10-K conveyed, "[t]he solar industry is highly competitive, and we expect to face increased competition as new and existing competitors introduce products or develop alternative technologies, which could negatively impact our business, financial condition and results of operations." About that risk, the 2024 10-K stated:

> We compete primarily against central and string inverter manufacturers, as well as against new solutions and emerging technologies that directly compete with our business. A number of companies have developed or are developing microinverters and other products that will compete directly with our solutions in the module-level power electronics market. We also compete against manufacturers of energy storage systems and EV chargers for our solutions in these markets.
>
> Competitors in the inverter market include, among others, SolarEdge, Huawei, Tesla, Sungrow Power Supply Co., Ltd., Growatt New Energy Co., Ltd and other companies offering string inverters with and without solar optimizers. Competitors in the storage market include Tesla, SolarEdge, Huawei, BYD, Franklin Solar Battery, and other producers of battery cells and integrated storage systems market. Competitors in the EV charger market include Wallbox, ChargePoint, Tesla, JuiceBox and EVBox, among others.
>
> Several of our existing and potential competitors are significantly larger than we are and may have greater financial, marketing, distribution and customer support resources and may have significantly broader brand recognition, especially in certain markets. In addition, some of our competitors have more resources and experience in developing or acquiring new products and technologies and creating market awareness for these offerings. Further, certain competitors may be able to develop new products more quickly than we can and may be able to develop products that are more reliable or that provide more functionality than ours. In

> addition, some of our competitors have the financial resources to offer competitive products at aggressive or below-market pricing levels, which could cause us to lose sales or market share or require us to lower prices of our products in order to compete effectively. Suppliers of solar products, particularly solar modules, have experienced eroding prices over the last several years and as a result many have faced margin compression and declining revenues. If we have to reduce our prices, or if we are unable to offset any future reductions in our average selling prices ("ASPs") by increasing our sales volume, reducing our costs and expenses or introducing new products, our revenue and gross profit would suffer.
>
> Significant developments in alternative technologies, such as advances in other forms of distributed solar PV power generation, storage solutions such as batteries, the widespread use or adoption of fuel cells for residential or commercial properties or improvements in other forms of centralized power production may have a material adverse effect on our business and prospects. Any failure by us to adopt new or enhanced technologies or processes, or to react to changes in existing technologies, could result in product obsolescence, the loss of competitiveness of our products, decreased revenue and a loss of market share to competitors.

80. The foregoing risk disclosure with respect to competition with Tesla and the significant development of alternative technologies as it relates to a loss of competitiveness was materially false because, having warned generally about competition and specifically from Tesla, Defendants were duty-bound to disclose that competition from Tesla's PW3 was negatively and materially impacting Enphase's sales and causing a glut of channel inventory, impacting Enphase's then current and future sales.

81. In addition, Defendants' disclosures about competition were materially false, violating SEC Regulation S-K, Item 303, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"). Item 303 requires registrants to disclose in management's discussion and analysis of a registrant's financial condition and results of operations ("MD&A"), "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Defendants' statements about inventory and competition misled investors for their omission of the trend relating to the material impact from Tesla's PW3 on Enphase's sales and its channel inventory.

82. On April 4, 2025, over Defendants Badri's signature, Defendants disseminated the 2024 CEO Letter. In it, they stated:

> We had a tough year. The solar industry, like many sectors tied to long-term investment and policy, was hit hard by rising interest rates, shifting regulations, and declining consumer confidence. At Enphase, we felt it across our core markets.

> Our revenue fell by 42%, compared to 2023. ***Channel inventory swelled, installers grew cautious, and demand cooled***.
>
> The slowdown began quietly in 2023 and turned into a full-blown pullback by mid-2024. In the United States, the shift to Net Energy Metering (NEM) 3.0 in California – our largest state market - combined with high interest rates made solar paybacks less attractive. In Europe, utility prices declined, policy uncertainty increased, and several of our partners, including long-time distributors and installers, exited the business entirely.
>
> For those of us who have seen cycles before, this one felt familiar but not any easier. I believe we managed the year with discipline and grit. We exited 2024 with healthy gross margins, generated nearly half a billion dollars in free cash flow, and maintained a strong balance sheet, including approximately $1.72 billion in cash, cash equivalents, restricted cash and marketable securities. We remained profitable while many in the industry did not.
>
> This did not happen by luck. We made hard decisions early. ***We cut shipments to distributors to allow the channel inventory to normalize***. ***We maintained pricing discipline rather than chase short-term volume***. We continued investing in the long game – new markets, smarter products, deeper installer training, and U.S. manufacturing capacity that gave us both resilience and margin.
>
> ***
>
> **A tougher global market: revenue composition and regional pressure** In 2024, 70% of our revenue came from the United States, with the remaining 30% generated internationally. Both segments faced distinct but significant challenges. In the United States, ***revenue fell 36% year-over-year, driven by persistently high interest rates, elevated inventory across our channel partners, and the transition to NEM 3.0 in California. This policy shift, coupled with higher financing costs, extended system payback periods and dampened near-term demand, particularly in the first half of the year***. Still, there were encouraging signs. ***Channel inventory began to normalize in the second half of 2024***. More importantly, the adoption of NEM 3.0 improved steadily, and by the end of 2024, approximately 66% of our California installs were under the new program. The learning curve has been real, but we and our installer partners have been adapting with resilience and agility.

83. The foregoing statements about a tougher global market and normalizing channel inventory were materially false and misleading because Defendants knew or recklessly disregarded that in addition to macroeconomic and/or industry headwinds, by mid-2024, Telsa's introduction of PW3 materially eroded Enphase's market share and sales, creating a material glut of channel inventory no later than the start of the Class Period. In a contracting and volatile solar installation market, with PW3's introduction, Defendants' claim that channel inventory was normal at eight to ten weeks misled investors as to both the current state of channel inventory and its impact on Enphase's future sales.

84. On April 22, 2025, at approximately 4:00 p.m. Eastern Time, Defendants issued an earnings press release for the quarter ended March 31, 2025 ("1Q2025 Press Release"). In the 1Q2025 Press Release, Defendants noted declining revenue, stating, "[t]otal revenue for the first quarter of 2025 was $356.1 million, compared to $382.7 million in the fourth quarter of 2024. Our revenue in the United States for the first quarter of 2025 decreased approximately 13%, compared to the fourth quarter. The decline, Defendants stated in the 1Q2025 Press Release, "was ***the result of seasonality and softening in U.S. demand***, partially offset by safe harbor revenue of $54.3 million." Defendants noted, too, that European revenue "increased approximately 7% for the first quarter of 2025, compared to the fourth quarter."

85. The foregoing statement about the decline in revenues in 1Q2025 from 4Q2024 was materially false and misleading because Defendants knew or recklessly disregarded that in addition to macroeconomic and/or industry headwinds, by mid-2024, Telsa's introduction of PW3 materially eroded Enphase's market share and sales, creating a material glut of channel inventory no later than the start of the Class Period. In a contracting and volatile solar installation market, with PW3's introduction, Defendants' claim that channel inventory was normal at eight to ten weeks misled investors as to both the current state of channel inventory and its impact on Enphase's future sales.

86. On April 22, 2025, at 4:30 p.m. Eastern Time, Defendants convened an earnings conference call to discuss the Company's 1Q2025 results ("1Q Call"). In his prepared remarks, Defendant Badri stated, "As we exited Q1, our battery channel inventory was normal, while our microinverter channel inventory was a little elevated."

87. The foregoing statement about channel inventory was materially false and misleading because Defendants knew or recklessly disregarded that in addition to macroeconomic and/or industry headwinds, by mid-2024, Telsa's introduction of PW3 materially eroded Enphase's market share and sales, creating a material glut of channel inventory no later than the start of the Class Period. In a contracting and volatile solar installation market, with PW3's

introduction, Defendants' claim that channel inventory was normal at eight to ten weeks misled investors as to both the current state of channel inventory and its impact on Enphase's future sales.

88. In addition, concluding his prepared remarks during the 1Q Call, Defendant Badri stated:

> Let me conclude. While the global policy environment remains fluid with tariffs, with interest rates and subsidies constantly evolving, ***we are moving quickly to realign our supply chain to minimize downside across a range of scenarios***.
>
> While we cannot control the macroeconomic conditions, we can absolutely control our response. This means doubling down on what has always made Enphase successful, relentless product innovation, world class reliability and exceptional customer service.

89. The foregoing statement about the effect of macroeconomic conditions was materially false and misleading because Defendants knew or recklessly disregarded that in addition to macroeconomic and/or industry headwinds, by mid-2024, Telsa's introduction of PW3 materially eroded Enphase's market share and sales, creating a material glut of channel inventory no later than the start of the Class Period. In a contracting and volatile solar installation market, with PW3's introduction, Defendants' claim that channel inventory was normal at eight to ten weeks misled investors as to both the current state of channel inventory and its impact on Enphase's future sales.

90. Also during the 1Q Call, analysts questioned Defendants about Enphase's channel inventory. Analyst David Benjamin of Mizuho asked, "you did mention that channel inventory was slightly up. Is that in Europe or is the US? And does that imply like any potential new destocking?" In response, Defendant Badri stated:

> No, ***the channel inventory is, okay, is up because when your sell-through goes down, the channel inventory can go slightly up, out of our usual targets***. Our targets are between eight and 10 weeks. So -- but when your sell-through is down more than what you anticipated, then that can go slightly up.
>
> The ways to recover it back are quite simple, not ship much into the channel and then improve the sell-through in a seasonal quarter like Q2, which is bound to have more sell-through in Q2 than Q1. ***So we believe it's a normal cycle, and we are disciplined to control the amount of material in the channel with that discipline, it should come back quickly inbound***.

91. The foregoing statements about the causes for elevated channel inventory and elevation being part of a normal cycle and denying the need to destock the channel were materially false and misleading because Defendants knew or recklessly disregarded that in addition to macroeconomic and/or industry headwinds, by mid-2024, Telsa's introduction of PW3 materially eroded Enphase's market share and sales, creating a material glut of channel inventory no later than the start of the Class Period. In a contracting and volatile solar installation market, with PW3's introduction, Defendants' claim that channel inventory was normal at eight to ten weeks misled investors as to both the current state of channel inventory and its impact on Enphase's future sales.

92. On April 22, 2025, Defendants filed with the SEC Enphase's Quarterly Report on Form 10-Q for the period ended March 31, 2025 ("1Q2025 10-Q"). With respect to Risk Factors, Defendants disclosed the additional risk that [c]hanges in the United States trade environment, including the imposition of import tariffs, could adversely affect the amount or timing of our revenue, results of operations or cash flows." In all other material respects, the 1Q2025 10-Q stated, "[a]ny of the risks discussed in the [2024] Form 10-K, in other reports we file with the Securities and Exchange Commission, and other risks we have not anticipated or discussed, could have a material adverse impact on our business, financial condition or results of operations. Except as set forth below," the 1Q2025 10-Q stated, "***there has been no material change to our risk factors*** from those disclosed in Part I, Item 1A, "Risk Factors" in the Form 10-K." Thus, the 1Q2025 10-Q incorporated by reference the 2024 10-K's Risk Factor concerning competition, titled, "The solar industry is highly competitive, and we expect to face increased competition as new and existing competitors introduce products or develop alternative technologies, which could negatively impact our business, financial condition and results of operations."

93. The 1Q2025 10-Q, incorporating by reference the 2024 10-K's Risk Factor concerning competition was materially false and misleading because, having warned generally about competition and specifically from Tesla, Defendants were duty-bound to disclose that

competition from Tesla's PW3 was negatively and materially impacting Enphase's sales and causing a glut of channel inventory, impacting Enphase's then current and future sales.

94. On July 22, 2025, at 4:30 p.m. Eastern Time, Defendants issued an earnings press release for the quarter ended June 30, 2025 ("2Q2025 Press Release"), including guidance for 3Q2025 of revenue between $330 million and $370 million.

95. In addition, on July 22, 2025, Enphase convened a conference call to discuss the same (the "2Q Call"). In prepared remarks, Defendant Badri stated, "[w]e reported quarterly revenue of $363.2 million, shipped 1.53 million microinverters and 190.9 megawatt hours of batteries and generated free cash flow of $18.4 million. Our Q2 revenue included $40.4 million of safe harbor revenue." He continued, "[a]s we exited Q2, ***our battery channel inventory was normal, while our microinverter channel inventory was slightly elevated***. For the second quarter, we delivered 49% gross margin, 21% operating expenses and 27% operating income, all as a percentage of revenue on a non-GAAP basis and including the net IRA benefit."

96. The foregoing statement about channel inventory for microinverters and batteries was materially false and misleading because Defendants knew or recklessly disregarded that in addition to macroeconomic and/or industry headwinds, by mid-2024, Telsa's introduction of PW3 materially eroded Enphase's market share and sales, creating a material glut of channel inventory no later than the start of the Class Period. In a contracting and volatile solar installation market, with PW3's introduction, Defendants' claim that channel inventory was normal at eight to ten weeks misled investors as to both the current state of channel inventory and its impact on Enphase's future sales.

97. Later in the 2Q Call, Defendants answered analysts' questions. In response to a question from analyst Praneeth Satish of Well Fargo, Defendant Badri expressed his personal view that total addressable market ("TAM") would decline by 20% in 2026, resulting from the elimination of the 25D residential solar credit. Defendant Badri's prescription for addressing the declining TAM was implementing lease financing, driving down installation costs, and reduction of customer acquisition costs. In response, analyst Satish stated "you mentioned that the micro

channel is slightly elevated. We know demand is going to decline in 2026 once the 25D credit expires." He then asked, "how do you intend on managing field inventories with distributors for the balance of the year? Do you plan to undership micros in either Q3 or Q4 to help reduce inventories," concluding "[o]r do you think inventories could just get rightsized more organically if we see maybe a pull forward of demand or some safe harbors in the second half?"

98. In response to analyst Satish's question about inventories and the impact of expected increase in demand related to the 25D credit expiration, Defendant Badri stated, "I think you answered the question yourself. Basically, that's exactly what we expect. We expect 25D increase in demand, which will come from the channel and make the channel at reasonable levels by the end of the year."

99. The foregoing statements about channel inventories relative to the expected increase in sales from the expiration of the 25D residential credit were materially false and misleading because Defendants knew or recklessly disregarded that in addition to macroeconomic and/or industry headwinds, by mid-2024, Telsa's introduction of PW3 materially eroded Enphase's market share and sales, creating a material glut of channel inventory no later than the start of the Class Period. In a contracting and volatile solar installation market, with PW3's introduction, Defendants' claim that channel inventory was normal at eight to ten weeks misled investors as to both the current state of channel inventory and its impact on Enphase's future sales.

100. Also during the 2Q Call, analyst Philip Shen of Roth Capital asked, "[a]nd then in terms of the elevated channel, how did we get to elevated channel levels? Was there a pause earlier in the year? Or did you overship into the channel?" He continued, "[a]nd what are the levels? Historically, you're -- when you got rightsized recently, you're at 8 to 10 weeks. I mean are we talking about 12 weeks now or something higher?"

101. In response, Defendant Badri stated, "[t]he question on channel, we are completely transparent to you. It is -- we are actually in very good shape in channel management. We -- our experience in the last two years on the quantity of undershipment, et cetera, that we had, we have

recognized that's an anomaly, and we will never get to that stage." Defendant Badri concluded, "[s]o whenever I say slightly above, it should mean slightly above 8 to 10. That's what it means."

102. The foregoing statement clarifying the meaning of normal was materially false and misleading because Defendants knew or recklessly disregarded that in addition to macroeconomic and/or industry headwinds, by mid-2024, Telsa's introduction of PW3 materially eroded Enphase's market share and sales, creating a material glut of channel inventory no later than the start of the Class Period. In a contracting and volatile solar installation market, with PW3's introduction, Defendants' claim that channel inventory was normal at eight to ten weeks misled investors as to both the current state of channel inventory and its impact on Enphase's future sales.

103. Also on July 22, 2025, Defendants filed with the SEC Enphase's Quarterly Report on Form 10-Q for the period ended June 30, 2025 ("2Q2025 10-Q"). With respect to Risk Factors, Defendants disclosed the additional risk that "[t]he reduction, elimination or expiration of government subsidies and economic incentives for on-grid solar electricity applications could reduce demand for solar PV systems and harm our business." In all other material respects, the 1Q2025 10-Q stated, "[a]ny of the risks discussed in the [2024] Form 10-K, in other reports we file with the Securities and Exchange Commission, and other risks we have not anticipated or discussed, could have a material adverse impact on our business, financial condition or results of operations. Except as set forth below," the 2Q2025 10-Q stated, "there has been no material change to our risk factors from those disclosed in Part I, Item 1A, "Risk Factors" in the Form 10-K." Thus, the 2Q2025 10-Q incorporated by reference the 2024 10-K's Risk Factor concerning competition, titled, "The solar industry is highly competitive, and we expect to face increased competition as new and existing competitors introduce products or develop alternative technologies, which could negatively impact our business, financial condition and results of operations."

104. The 2Q2025 10-Q, incorporating by reference the 2024 10-K's Risk Factor concerning competition was materially false and misleading because, having warned generally about competition and specifically from Tesla, Defendants were duty-bound to disclose that

competition from Tesla's PW3 was negatively and materially impacting Enphase's sales and causing a glut of channel inventory, impacting Enphase's then current and future sales.

## VI. THE TRUTH EMERGES

105. On October 28, 2025, at 4:05 p.m. Eastern Time, Defendants issued an earnings press release for the quarter ended September 30, 2025. For 3Q2025, Defendants reported net income of $66.6 million on revenue of $410.4 million, including $70.9 million safe harbor revenue. With respect to the Company's financial outlook for 4Q2025, Defendants guided to revenue of $310 million to $350 million. This guidance included no safe harbor revenue. Analysts had estimated 4Q2025 revenue guidance to fall between $374.4 million and $383 million.

106. Also on October 28, 2025, at 4:30 p.m. Eastern Time, Defendants convened an earnings conference call to discuss the Company's 3Q2025 results and their guidance for 4Q2025 and 1Q2026. In prepared remarks, Defendant Badri stated, "[a]s we exited Q3, our microinverter channel inventory returned to normal, while our battery channel inventory was slightly elevated due to sell-in of our new fourth-generation battery." Critically, however, notwithstanding his description of microinverter channel inventory as normal, admitting a glut of batteries and microinverters in the channel, Defendant Badri stated "we are reducing shipments of product to the channel in order to destock the channel as we head into 2026. This positions us," he continued, "to enter 2026 with a healthy channel, setting us up for a clean Q1 and beyond. Currently, we are approximately 75% booked to the midpoint of our Q4 revenue guidance."

107. Thus, Defendants finally admitted that channel inventory was materially too high, even as they continued to omit that loss of market share to Tesla's PW3 was a material cause of that inventory glut.

108. On this news Enphase's stock price fell $5.56, or 15.15%, to close at $31.14 on October 29, 2025.

## VII. CLASS ACTION ALLEGATIONS

109. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

otherwise acquired the publicly traded common stock of Enphase during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company and, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a material interest.

110. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ under the ticker symbol "ENPH." While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

111. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

112. Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

113. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether Defendants' acts as alleged violated the federal securities laws;

b. whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of Enphase;

c. whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d. whether the Individual Defendants caused Enphase to issue false and misleading SEC filings and public statements during the Class Period;

e. whether the Enphase Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

f. whether the prices of Enphase's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

g. whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

114. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

115. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b. the omissions and misrepresentations were material;

c. throughout the Class Period, the Company's securities are traded in an efficient market;

d. the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

e. the Company traded on the NASDAQ, a highly efficient and automated market, and was covered by multiple analysts;

f. the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

g. Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

h. Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

116. Based upon the foregoing, the market for Enphase's securities promptly digested current information regarding Enphase from all publicly available sources and reflected such information in Enphase's stock price. Under these circumstances, all purchasers of Enphase's securities during the Class Period suffered similar injury through their purchase of Enphase's securities at artificially inflated prices and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

117. The Rosen Law Firm satisfies the criteria of Fed. R. Civ. P. 23(g) and will fairly and adequately represent the interests of the Class.

118. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## VIII. LOSS CAUSATION

119. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

120. During the Class Period, Plaintiff and the Class purchased Enphase common stock at artificially inflated prices and were damaged thereby. The price of Enphase common stock materially declined when the misrepresentations Defendants made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were corrected, causing investors' losses.

## IX. NO SAFE HARBOR

121. Enphase's "Safe Harbor" warnings accompanying its reportedly forward-looking guidance statements issued during the Class Period were ineffective to shield whose statements from liability. There were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Enphase who knew that the statement was false when made.

122. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the non-forward-looking statements alleged as false in this Complaint. Those statements relate to then-existing facts and conditions.

## X. COUNTS

### COUNT I
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

123. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

124. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

125. During the Class Period, Enphase and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and omitted material facts.

126. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

127. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading and omitted material information; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements or material omissions, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein. Information showing that the Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Defendants' knowledge and control. As the senior managers and/or directors of Enphase, the Individual Defendants had knowledge of the details of Enphase's internal affairs.

128. The Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

129. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or on the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements and omissions.

130. Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

131. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

132. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II
## Violation of Section 20(a) of The Exchange Act
## Against The Individual Defendants

133. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

134. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Enphase's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's financial position and business practices.

135. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by Enphase which had become materially false or misleading.

136. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Enphase disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Enphase to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Enphase's securities.

137. Each of the Individual Defendants, therefore, acted as a controlling person of Enphase. By reason of their senior management positions and/or being directors of Enphase, each of the Individual Defendants had the power to direct the actions of, and exercised the same, to cause Enphase to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Enphase and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

138. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## XI. PRAYER FOR RELIEF

139. WHEREFORE, Lead Plaintiff demands judgment against Defendants as follows:

a. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as Class representatives;

b. Awarding compensatory damages in favor of Plaintiff and the members of the Class against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c. Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

d. Awarding such other and further relief as this Court may deem just and proper.

## XII. DEMAND FOR A JURY TRIAL

140. Plaintiff hereby demands a trial by jury.

Dated: September 8, 2026

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**
*/s/ Jacob Goldberg*
Jacob A. Goldberg
Gonen Haklay
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Fax: (212) 202-3827
Email: jgoldberg@rosenlegal.com
Email: ghaklay@rosenlegal.com

and

Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Lead Plaintiff and the Class*